UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUZANNE WASHBURN,

        Plaintiff,

v.

        Case No. 09-CV-10202

        HON. GEORGE CARAM STEEH

GENERAL ELECTRIC CAPITAL,
CORPORATION,

        Defendant.
_____/

OPINION AND ORDER DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On January 19, 2009, plaintiff Suzanne Washburn filed a complaint against her former employer, defendant General Electric Capital Corporation ("GE Capital"), alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2201 *et seq.*, relating to the termination of her employment. Before the court is defendant's motion for summary judgment. Oral argument occurred at a hearing on this motion on June 29, 2011. For the reasons that follow, the court DENIES defendant's motion for summary judgment.

EVIDENCE

Plaintiff was a district manager (DM) in GE Capital's Transportation Finance Group. The Transportation Finance Group provides financing for the commercial trucking industry, including lending products, growth capital, revolving lines of credit, equipment leasing, cash flow programs, and asset financing. The Transportation Finance Group is based in Texas and has multiple branch offices throughout the United States.

During the time period at issue in this case, GE Capital had a code of conduct

entitled "The Spirit and The Letter," which sets forth the company's fair employment practices. The code of conduct provides that the company will "make all employment related decisions and actions without regard to a person's . . . sex . . . or other characteristic protected by law." Plaintiff received a copy of "The Spirit and The Letter" during her employment with GE Capital and attended training about prohibited harassment. In addition, all managers at the company, including Jim Flanigan, receive training on "The Spirit and The Letter."

In June 1980, McCullough Leasing hired plaintiff as a clerk in the retail department. In 1990, GE Capital Fleet Services acquired McCullough Leasing, and plaintiff was hired by GE Capital Fleet Services as an administrative secretary. Plaintiff held various positions at GE Capital and her 2005 work performance rating was "Needs Improvement." Toward the end of 2005, Stanley Boris, who was Sales Manager for GE Capital Transportation Finance Group, offered to interview plaintiff for the DM position. Plaintiff also interviewed for the position with Jim Flanigan, John Conkin, and Dan Clark. At the time of plaintiff's hiring, Boris was aware that plaintiff's performance was under scrutiny. Flanigan was also told that plaintiff was on a Performance Improvement Plan (PIP). Flanigan recommended that GE Capital hire plaintiff for the DM position and Conkin approved the hiring. When Conkin made the final hiring decision, he was aware of plaintiff's "Needs Improvement" performance rating.

On April 26, 2006, Boris sent plaintiff an e-mail outlining general performance expectations for the DM position. Specifically: (1) the normal annual sales volume requirements for plaintiff's territory were $25 to $30 million; (2) after she was in the position for 90 days, she should meet sales volumes of $1 million each month; and (3) by the end

of 2006, she should meet sales volumes of $2 million each month.

In June 2006, plaintiff started in the DM position. She reported to Boris, who reported to Flanigan, who reported to Conkin. As DM, plaintiff was responsible for procuring clients to whom GE Capital would lend money. This included calling on dealers, trucking companies, and companies with trucking fleets in the territory to try to generate business. DMs were responsible for entering their weekly itineraries, such as information relating to telephone calls, meetings, action items, and potential transactions into a sales database system called Siebel. Boris and Flanigan reviewed each DM's Siebel entries on a regular basis. They also expected all DMs to make a monthly marketing plan, which Boris reviewed with each DM on a weekly basis.

Plaintiff was assigned the eastern Michigan sales territory, which originally was to include the Detroit metropolitan area and Toledo, Ohio. When she transferred to the position, there had been no DM assigned to the Detroit metropolitan area for approximately three or four years. During that time, DM Douglas Moeller serviced clients in the Toledo area. Once plaintiff took the DM position, Boris allowed Moeller to continue his assignment because he had been servicing that area. Plaintiff complained to Flanigan about the change in the territorial division and Flanigan never responded. Plaintiff never serviced the Toledo area during her employment as a DM. Her sales goals were based on Michigan only.

To determine plaintiff's sales goals, Boris reviewed written data relating to the vehicle population and the customer bases in the territory. He also reviewed historical business in the territory. Plaintiff's annual sales goals were as follows: $12 million for 2006; $24 million for 2007; and $21 million for 2008. Plaintiff understood that GE Capital

3

expected her to reach her sales goals.

Plaintiff's total sales volume for 2006 was $2,917,300. Her goal for 2006 was $12 million. Sometime in early 2007, Boris became concerned about plaintiff's ability to generate sales volume. At that point, Boris met with plaintiff to review her sales plan and determine what he could do to help her succeed. In addition, Boris traveled to plaintiff's territory to observe her job performance and identify any missed opportunities. Finally, Boris spoke with plaintiff on a regular basis to review her progress.

On or about March 19, 2007, plaintiff met with Boris and Flanigan in Chicago to discuss her work performance. According to plaintiff, when Flanigan joined the meeting he would not acknowledge her. Flanigan then allegedly told her, "I want you to give an explanation as to why your [Siebel] schedule is not filled and I'm not seeing anything." At that point, Boris turned his computer to show Flanigan that plaintiff's schedule was complete. Plaintiff alleges that after this meeting, Boris told her that Flanigan told him that he "did not believe that a female should be in [the DM] position." Flanigan denies making this statement. Flanigan believes that his limited contact with plaintiff was due to his limited contact with DMs unless asked to participate in sales calls. Flanigan contends that he did not attend any sales calls with plaintiff because she did not ask him to attend sales calls and because he does not know many customers in her territory.

On March 21, 2007, Boris sent an e-mail to plaintiff stating that her sales volume for the first quarter of 2007 was an estimated $2.5 million. The e-mail also stated that she must "demonstrate continuous improvement in [the second quarter] with a target achievement of $4.5 [million] and then a minimum of $2 [million] per month thereafter . . ." Also in 2007, Boris issued plaintiff her 2006 performance review, which is referred to as an

4

"EMS" (Employee Management System). Under the "Contributions/Performance Trend" category, Boris stated that "[plaintiff] needs continued improvement in her performance to achieve required volume objectives." Plaintiff did not dispute the content of her 2006 EMS with Boris. Plaintiff does not believe her EMS was based on sex.

As of August 31, 2007, plaintiff's total sales volume for the year was $5.3 million. Her goal for the same time period was $15 million. In September 2007, Boris placed plaintiff on a PIP because she was not meeting her sales volume goals. Conkin gave the final approval to issue the PIP. The PIP provided that:

> [T]he following volume objectives over the next 3 [sic] will be established as the minimum level required to achieve your performance improvement plan during the months of September, October and November: September $1.5M[;] October $1.8M[;] November $2.0M[; and] Total $5.3M . . . Subsequent to October, you will be expected to continue to achieve your minimum quarterly volume objective of $6.0M on an ongoing basis . . . Sue, this letter is intended to reiterate that we require improvement with respect to volume achievement for the Eastern Michigan territory . . . GE Commercial Finance does not repeat performance improvement action plans. Failure to achieve the minimum volume stated above could result in further action up to and including termination.

Plaintiff understood that she was responsible for meeting the sales goals outlined in the PIP and that failure to meet those goals could result in termination of her employment. Plaintiff does not believe that the issuance of her September 2007 PIP was related to sex.

In early January 2008, plaintiff claims she received a phone call from Boris advising her that he was told by Flanigan that she was "done," meaning her employment was terminated. Plaintiff immediately contacted the Human Resources Department and spoke with Representative Binh Le. During this telephone call, plaintiff asked Le about her employment status. Plaintiff claims that during this conversation Le told her GE Capital was formally notifying her that within 90 days her employment would be terminated. He

also recommended that she resign. According to plaintiff, she told him that she was being treated differently than her male counterparts under the supervision of Flanigan and that she felt her situation was due to her gender.

On or about January 7, 2008, Boris issued plaintiff a memorandum regarding her PIP progress. The memorandum stated:

> During the plan period, you achieved the following volume levels: September $.5M[;] October $1.4M[;] November $.1M[; and] and Total $2.0M . . . This represented a 38% achievement level against the performance plan minimum. In December you booked $1.7MM . . . which would give you a total for the 4 months of $3.7MM or 51% achievement of the performance plan level. Overall, your performance is still rated as Needs Improvement, and you have not successfully met the outlined objectives of the Performance Improvement Plan we initiated in September 2007. As stated in my September 10th letter, your failure to meet the objectives in the PIP could result in further action by GE, including termination.

Plaintiff's total sales volume for 2007 was $8,824,400 and her sales goal for that period was $24 million. Plaintiff does not believe that the issuance of the PIP progress memorandum was related to her sex.

In February 2008, plaintiff received her 2007 EMS from Boris. Under the category of "Contributions/Performance Trend," the EMS states "Sue's performance needs improvement in 2008 to achieve her required volume objectives." In early 2008, Boris transferred from the Sales Manager position to the Medium Duty Finance Representative position. In March 2008, he voluntarily resigned. Plaintiff then began reporting to Sales Manager Jim Loughery. On March 27, 2008, Flanigan emailed Boris requesting he discharge plaintiff. Boris then emailed Le stating that it would be inappropriate for him to fire her because he was no longer her manager. Boris also said, "Michigan may not be able to support two DM's and a $48MM budget at this time. [Plaintiff] has called on

customers and dealers as I have asked her to do.  GE has a presence in the Detroit market because of her efforts but the [sales] volume has not followed as of this date . . . [I]f it is determined that the company should terminate her, my recommendation is that her position be considered as a reduction in force . . ."

During the first quarter of 2008, plaintiff's sales volume was $2,897,200 and her goal was $3,822,000.  On April 1, 2008, plaintiff received a memo from Flanigan terminating her employment effective April 4, 2008.  Conkin made the final decision to discharge plaintiff after consulting with Flanigan and Le.  Flanigan testified that plaintiff is the only DM whose employment he recommended be terminated.

Other DMs in the Transportation Finance Group were issued warnings by Boris, Flanigan, and Loughery.  On or about August 24, 2005, Boris issued a PIP to DM Victor Siegel because he was not meeting his sales goals.  Siegel ultimately did not meet his PIP requirements and resigned in lieu of termination.

On or about April 3 and 4, 2008, Flanigan and Loughery issued performance counseling memorandums to Thomas Rayburg, John Mauer, and Mike Hirsch because they failed to meet their sales goals in 2007 and for the first quarter of 2008.  None of these male DMs received a PIP and none of these male DMs were fired.  Boris testified that the decision to issue a PIP to a DM is based on "making progress, historically how they performed, and whether they were continuing to make progress in their numbers."  When testifying as to why the male DMs were not issued PIPs, Boris said Rayburg had not worked for a full year and was trending upward, Mauer had a solid pipeline and was trending upward, and Hirsch "had a history of high performance."  Another DM, Moeller, was never issued a counseling memorandum for failing to meet his sales goals because

2:09-cv-10202-GCS-RSW   Doc # 40   Filed 07/20/11   Pg 8 of 16    Pg ID 1187

Boris believed "he was a solid performer historically."

Flanigan testified that plaintiff was issued a PIP and other DMs were not because she did not meet sales numbers, and her marketing plan, itinerary, sales calls, and projections were unsuccessful. During the period in which plaintiff worked as a DM, she was the lowest-rated performer in the Transportation Finance Group. Plaintiff was the only female DM working under Boris and Flanigan during the period in which she was employed by defendant.

STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment forthwith if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Edward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "[T]he

8

mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. Id.

ANALYSIS

To establish a claim under Title VII and the Elliott-Larsen Civil Rights Act, plaintiff may either present direct or circumstantial evidence of discrimination. "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Shering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999). Also, "direct evidence of discrimination does not require the factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003). Once direct evidence has been presented, "the burden of persuasion shifts to the defendant to show that it would have terminated the plaintiff's employment had it not been motivated by discrimination." Jacklyn, 176 F.3d at 926.

To establish a claim using circumstantial evidence, plaintiff's evidence needs to allow the fact finder to draw a reasonable inference that discrimination occurred. Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 2003). Plaintiff is required to first establish a *prima facie* case by showing that (1) she was a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for her position, and (4) she was treated differently than similarly situated employees. Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006) (describing the McDonald Douglass Corp. elements to establish a *prima facie* case). The Sixth Circuit has summarized the burden shifting as follows:

> Under the McDonnell Douglas burden-shifting framework, once the plaintiff establishes a prima facie case of intentional discrimination, the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions. The defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times. Once the defendant has articulated a nondiscriminatory reason for its decision, the presumption of discrimination that arises from the plaintiff's prima facie case disappears and the plaintiff must have the opportunity to show that the defendant's proffered explanation is merely a pretext for discrimination.

Weigel v. Baptist Hosp., 302 F.3d 367, 377-78 (6th Cir. 2002) (internal citations omitted). When defendant establishes a non-discriminatory reason for termination, it becomes plaintiff's burden to show that defendant's proffered reason for termination is mere pretext. To meet her burden, "plaintiff must show that 'either (1) the proffered reason had no basis *in fact*, or (2) that the proffered reason did not *actually* motivate [her] discharge, or (3) that [the proffered reason was] *insufficient* to motivate the discharge.'" Russell v. Univ. of Toledo, 537 F.3d 596, 604 (6th Cir. 2008) (emphasis in original) (citing Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994)).

As the following discussion indicates, plaintiff has successfully presented direct

evidence of gender discrimination. It should also be noted that plaintiff can establish a *prima facie* case using circumstantial evidence of disparate treatment as compared to her male counterparts. Defendant only seriously challenges plaintiff's ability to show that she was treated differently than similarly situated employees. However, plaintiff satisfies this element as discussed in the pretext section of this opinion.

**Plaintiff's Direct Evidence of Discrimination**

Plaintiff argues that Boris's statement to her describing Flanigan's statement about not wanting a female in the DM position constitutes direct evidence of discrimination. Plaintiff also alleges Flanigan's behavior at the March 19, 2007 meeting and Flanigan's failure to attend sales calls with plaintiff constitute direct evidence of discrimination.

Defendant argues Boris's statement is inadmissible hearsay. Plaintiff contends Boris's statement is not hearsay. Under FRE 801(d)(2)(D), a statement is not hearsay when it is "offered against a party" which was made "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." The alleged statement is offered by plaintiff and was allegedly made by Boris during Boris's employment with defendant. Defendant argues that Boris's statement was not made during the scope of his employment because, "there is a critical difference between making a statement as an employee and having the actual or implied authority to make such a statement on behalf of your employer." Jacklyn, 176 F.3d at 928. In Jacklyn, the plaintiff attested that her manager told her that the regional manager said he did not want any "skirts" working for him. Because the regional manager who allegedly made the "skirts" statement was not the regional manager at any time when the manager was supervising the plaintiff, and because the manager was not involved in any

11

of the critical appraisals preceding the plaintiff's leave, the court concluded the manager's statement was not within the scope of his employment. Id. Conversely, Boris's alleged statement about Flanigan's alleged statement was made at a time when Boris was plaintiff's direct supervisor and Boris reported to Flanigan. Boris issued plaintiff a PIP, plaintiff failed to meet her goal, and plaintiff was terminated upon Flanigan's recommendation. Therefore, Boris's statement falls within the scope of his employment and thus is not hearsay.

Defendant also argues plaintiff's description of Boris's alleged statement is an inadmissible opinion of a lay witness under FRE 701. However, plaintiff is testifying about a fact and is not asserting an opinion. Next, defendant argues Boris's statement is inadmissible because plaintiff "bears the burden of establishing the proper foundation for the admissibility of the statements." Liadis v. Sears, Roebuck & Co., 47 F. App'x 295, 303 (6th Cir. 2002)). Defendant claims plaintiff did not establish a proper foundation. According to plaintiff, Flanigan treated her in a bizarre manner during the March 2007 meeting. Plaintiff asserts that when she asked Boris about Flanigan's behavior, Boris told her that Flanigan stated that he "did not believe that a female should be in [the DM] position." Plaintiff infers that the temporal proximity of the comment to the bizarre interaction at the meeting establishes a foundation. Drawing all inferences in favor of the non-moving party, plaintiff has established that Flanigan was speaking about her position with the company.[1]

Defendant further claims that even if Boris's statement is admissible, the statement

---

[1] Defendant argues that the FRE 804(b)(3) does not apply. This rule only applies when the declarant is unavailable. Boris and Flanigan are available to testify and both were deposed. The court does not need to address this issue because plaintiff has already established Boris's statement was not hearsay.

12

is not direct evidence of discrimination because Flanigan was not the final decision maker in plaintiff's termination. Defendant relies on McDonald v. Union Camp Corp., 898 F.2d 1155, 1161 (6th Cir. 1990) which found "a statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official." However, the Supreme Court recently held an employer liable when "one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." Staub v. Proctor Hosp., 131 S. Ct. 1186, 1193 (2011). Because Flanigan was plaintiff's supervisor and was involved in her termination, plaintiff can use his statement to establish discriminatory animus.

To constitute direct evidence, "the evidence must establish not only that the plaintiff's employer was predisposed to discrimination . . . but also that the employer acted on that predisposition." Hein v. All Am. Plywood Co., 232 F.3d 482, 488 (6th Cir. 2000). In Hein, a case involving weight discrimination, the Sixth Circuit found "[plaintiff] presented no evidence to connect [defendant's] alleged prejudice against heavier individuals with his decision to fire [plaintiff]." Id. at 489. The court in DiCarlo v. Potter, 358 F.3d 408 (6th Cir. 2004) held that a closer temporal proximity between the discriminatory act and the termination allows for a lesser quantum of evidence needed to conclude discriminatory animus motivated termination. Id. at 416-17. The alleged statements and behavior upon which plaintiff relies occurred around March 19, 2007. She was issued her PIP in September 2007 and terminated in April 2008. A factfinder could reasonably conclude from Flanigan's statement that he was predisposed to discrimination. Flanigan was defendant's agent, he recommended that plaintiff's employment be terminated, and plaintiff was

13

terminated. Drawing all inferences in favor of plaintiff, plaintiff has set forth sufficient direct evidence of sex discrimination.

**Defendant's Non-Discriminatory Reason for Termination**

As plaintiff can establish direct evidence of discrimination, the court reviews defendant's alleged reason for plaintiff's termination. Plaintiff never met a sales goal, was the lowest rated sales performer, was placed on a PIP, and failed to meet the standards set forth in the PIP. Moreover, Boris attempted to help plaintiff meet her sales goals but she still failed. Based on plaintiff's poor performance, it is reasonable for the court to accept defendant's reason for terminating her as non-discriminatory.

**Plaintiff's Pretext Evidence**

Plaintiff claims defendant's proffered reasons did not actually motivate her discharge. She relies upon Flanigan's discriminatory statement, her allegedly arbitrary and unreasonable sales goals, and the difference between defendant's treatment of her and her male counterparts.

Plaintiff argues Flanigan's alleged statement portrays defendant's discriminatory motive and shows that Flanigan's recommendation to discharge plaintiff was based on his discriminatory animus towards females in the DM position. Defendant counters by relying on the "same-actor inference," arguing that because Flanigan and Conkin were willing to hire plaintiff knowing she is female they are unlikely to fire her because of her sex. Yet, the Sixth Circuit rejected the idea that a mandatory "same-actor inference" be applied "in favor of a summary judgment movant." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 573 (6th Cir. 2003). Additionally, the length of time between plaintiff's hiring and firing weakens the "same-actor inference." Buhrmaster v. Overnite

14

Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995).

Plaintiff also asserts that her sales goals were arbitrary and raise a genuine issue as to whether they were set to ensure her failure. She claims that defendant's reliance on the territory's historical sales data to set her goals is arbitrary because her territory had not had a representative for three to four years and Detroit has had a declining business market. Boris even testified that Michigan may not have enough sales opportunities to handle two DMs. Defendant answers by explaining that DM sales goals are set using the same procedure regardless of sex. All DM sales goals are based on the overall goal for the Chicago region plus past sales goals for each territory. Because no recent sales goals were available for plaintiff's territory, defendant relied on vehicle population, customers data, and dealer bases. The Sixth Circuit found that it is irrelevant whether a company's sales goals were reasonably set, "so long as the [company] applied them equally . . ." Brown v. Bank One, 168 F. App'x 46, 2006 WL 348133 at *52 (6th Cir. Feb. 14, 2006). Defendant claims the goals were applied equally among male and female DMs. For example, it issued Siegel a PIP and issued Mauer, Hirsch, and Rayburg performance counseling memorandum for failing to meet sales goals. Plaintiff argues that no male DMs who failed to meet sales goals were issued PIPs or fired during her employment. Defendant relies on plaintiff's poor performance to distinguish its actions regarding plaintiff and male DMs. However, out of the ten remaining DMs who worked under Flanigan, all of whom were male, five failed to come within 10% of their sales goals and were not issued PIPs or fired. Additionally, plaintiff claims defendant knew of Detroit's declining market and only lowered her sales goals 3%.

Finally, plaintiff argues that the disciplinary actions taken against male DMs, which coincided with her termination, raise a genuine issue as to defendant's discriminatory motive. Plaintiff claims defendant took disciplinary actions against the male DMs as a prophylactic measure. Mauer, Rayburg, and Hirsch were each disciplined on or around April 4, 2008, the same day plaintiff was fired. Defendant counters by noting that Siegel was issued a PIP before plaintiff was hired. However, Flanigan testified that plaintiff was the only DM whose employment he recommended be terminated. Viewing the evidence as a whole, and in the light most favorable to plaintiff, the court finds a genuine issue of material fact as to whether defendant's reason for plaintiff's termination is mere pretext.

CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is DENIED.

Dated: July 20, 2011

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on July 20, 2011, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk